TUCKER, Judge.
This is a suit by the plaintiff, C. M. Penn & Sons, Inc., against the defendant, A. Giambelluca Construction Company, in which plaintiff seeks to recover the value of certain dirt fill hauled, delivered and spread by plaintiff under a subcontract with the defendant. By supplemental and amended petition plaintiff also claimed damages resulting from the loss of anticipated profits which it failed to realize on account of the breach of the subcontract by the defendant. The original contract was between the Illinois Central Railroad Company, which is not a party to this suit and defendant-appellant, A. Giambelluca Construction Company, with whom the railroad company contracted for the loading, hauling, filling and spreading of dirt in an area adjacent to the Illinois Central Railroad tracks in Ascension Parish, for the purpose of forming a railroad yard, said “placing and spreading” to be done “as per plans and specifications prepared by Illinois Central Railroad.”
Defendant A. Giambelluca Construction Company in turn sub-contracted with plaintiff-appellee C. M. Penn & Sons, Inc., on July 28, 1967, to “(1) Clear and grub batture so as to be able to load batture sand. .(3) Loading, hauling, and spreading approximately 90,000 cu. yds. of fill for which the actual yardage hauled is to be determined by cross sections made by the Illinois Central Railroad.” at the rate of $1.20 per cu. yd. Paragraph 4 provided that the Subcontractor abide by any additional specifications, drawings, or explanations furnished by the Architect or Engineer to detail and illustrate the work to be done. Paragraph (5) (b) provided that the work of the Subcontractor be completed to the satisfaction of the Contractor or Owner within 90 working days after commencement.
Work was initiated under the sub-contract on October 3, 1967, and on October 10, 1967, plaintiff, hereinafter referred to as Penn, was told by Mr. Weeks, a representative of Illinois Central Railroad that they were to “compact” the dirt. Penn informed the railroad representative that their contract did not call for “compaction”. On the following day Penn related the railroad representative’s request to defendant Anthony Giambelluca, Jr., who assured them that the railroad had been in error, and that they were not to “compact” the dirt. Defendant’s employee, Anthony Giambelluca, Jr., discussed the matter further with the Illinois Central Railroad and its representatives, who indicated to him that, if the dirt were spread by Penn and “packed down” some, this would be sufficient. Plaintiff Penn agreed to this even though they did not think that their contract called for it. They continued to load, haul, and fill the dirt by their usual method of dumping a number of truck loads of fill in the area, and then rolling over the piles with a bulldozer, thereby leveling the mounds and packing the dirt to some extent. The Illinois Central Railroad representative again visited the site and demanded that the dirt be “compacted” in order to support a railroad yard. Penn again informed the railroad representative that their contract did not call for “compaction”, and that they could not do it without great additional expense which had not been computed in the contract price.
At this point defendant, Giambelluca Construction Company, agreed to “compact” the dirt itself, using its own equipment. After a few days defendant realized that its own equipment was improper for the job and requested use of plaintiff’s large rubber tire tractor for the process. Plaintiff Penn refused for the reason that their contract did not call for it, and also for the reason that the “compaction” process would have required many more yards of dirt, and would have affected the contract price greatly.
Whereupon defendant Giambelluca sent a telegram to Penn on October 26, 1967, placing them in default and stating that they had not complied with the terms of the contract between them. Giambelluca in *596 voked paragraph 10 of the contract as follows :
“10. Should Subcontractor at any time refuse or neglect to supply a sufficient number of properly qualified workmen, or a sufficient quantity of materials of proper quality, or abandon the work or fail in any respect to prosecute the work covered by this contract with promptness and diligence, or fail in the performance of any of the agreements therein contained, Contractor may, at its option, after forty eight (48) hours notice to Subcontractor, provide any such labor and materials, and deduct the cost thereof from any money then due or thereafter to become due to Subcontractor under this contract or otherwise; or Contractor may, at its option, terminate this contract and, for the purpose of completing the work covered by this contract, Contractor shall have the right to take possession of all the materials, tools, and appliances belonging to Subcontractor at the site of the work, and Contractor may either complete said work, or may employ, or contract with, any other person or persons to complete the work and provide the materials therefore; and in case of such termination of this contract, Subcontractor shall not be entitled to receive any further payment under this contract until said work shall have been finished completely and payment therefor made by Owner, at which time if the unpaid portion of the amount to be paid under this contract exceeds the charges, expenses, and damages sustained by the Contractor in completing the work or as a result of such default, such excesses shall be paid by Contractor to Subcontractor, but if such charges, expenses, and damages shall exceed said unpaid portion, Subcontractor shall pay the difference to Cbn-tractor.”
Penn left the job site and filed suit against Giambelluca, aleging that it was in complete compliance with the contract between the parties. In its original petition Penn claimed Giambelluca owed it damages for breach of contract by the defendant in the sum of Thirty Thousand and No/100 ($30,000.00) Dollars, representing the value of the volume of dirt fill already emplaced by Penn for Giambelluca. By its supplemental and amending petition the plaintiff elevated this item of damages to the sum of $35,000.00 and also added to its demand the sum of $23,000.00 as damages for the loss of anticipated profits on the unfinished portion of the job.
Defendant Giambelluca Construction Company reconvened, alleging that it was required to complete the job for the Illinois Central Railroad Company, charged plaintiff Penn with breach of contract and asked for damages in an amount to be specified at the time that the job should be completed.
Judgment was given in the lower court in favor of Penn Brothers in the amount of Thirty-one Thousand Nine Hundred Twenty and no/100 ($31,920.00) Dollars, plus interest and costs, representing the value under the subcontract of 26,600 cubic yards of fill already emplaced by the plaintiff at the site. Defendant Giambelluca Construction Company has appealed from this judgment alleging error by the court in finding that Giambelluca required “compaction” in addition to “spreading”, thereby breaching the contract between the parties, instead of finding in accordance with appellant’s contention that appellee breached the contract by refusing to spread the dirt properly. In the event that the court should find that appellant breached the contract, appellant argues alternatively that the award of damages by the lower court was excessive.
Although several grounds for breach of contract have been mentioned in passing, *597 such as inadequate manpower, equipment and supervision of the job, the primary-issue to be resolved by this court is whether or not the contract between the parties did indeed require “compacting” of the fill. The experts testifying in this case are in substantial agreement as to the definition of “compaction”. The lower court adopted the expert opinion of Mr. Louis J. Capoz-zoli in regard to “compaction,” and this court in turn adopts the opinion of the lower court in which it set forth the views of Mr. Capozzoli as follows:
“He testified by deposition quite clearly that compaction was an essential factor to be considered in the drawing of contracts for the construction of foundations and land-fills. He explained that three types of compaction are usually employed in the industry. The first of which is accomplished by merely running the hauling equipment over the fill. The second which requires compaction machinery, the third, obtaining compaction to a required percentage by use of compaction machinery followed by testing with laboratory facilities. This last method is the only one by which the degree of compaction could be definitely determined.
Mr. Capozzoli further testified that in local usage some degree of compaction was always stipulated in land-fill contracts. He pointed out that the type of fill to be used was of itself one of the factors which determined the need. For example, gravel requires little compaction, sand requires some compaction and clay requires the most. It was his conclusion the word ‘spreading’ was never used to embrace or include compaction.”
It is the argument of Giambelluca that the concept of compacting was included within the contractual obligation of “spreading”. The evidence is overwhelming in this case, however, that, not only is “compaction” a very different process from spreading, but also, that none of the parties contracting for the project involved herein intended for the dirt to be “compacted”. Even Anthony Giambelluca, Jr., defendant in the instant case, testified several times that “compaction” was not within the purview of the contract. It was only after the Illinois Central Railroad, with which defendant had originally contracted, began to pressure him to compact the dirt, that lie began to speak in these terms to plaintiffs. Certainly the contract between these parties contains no mention of “compaction”. Since compaction does require more fill, it would be quite unreasonable to believe that plaintiff intended to “compact” the dirt it hauled in without a higher price. This court agrees with the lower court in its finding that compaction is a different process from spreading and that compaction was not included in the contract between the parties herein.
This court agrees with the lower court, also, in its finding that defendant manifested an intention to cancel the contract between the parties when it moved in its equipment despite plaintiff’s protest and began to “tighten” the dirt. There can be no doubt that they canceled the contract when they acted upon their apparent intention by sending plaintiff a notice that they were in default. Defendant was within its rights in cancelling its contract with Penn, but in so doing it became liable to plaintiff Penn under C.C. Art. 2765 for “the expense and labor already incurred, and for such damages as the nature of the case may require”.
The record is devoid of evidence which would justify a judgment against the defendant for the loss of any anticipated profits experienced by the plaintiff as a result of its being prohibited from completing the subcontract.
In the instant case Richard Fergus, a Civil Engineer and surveyor, estimated that Penn had loaded and hauled 26,600 cubic yards of dirt to fill the cross sections in the area designated to the required elevation. At the contract price of $1.20 per cubic yard, this amounts to Thirty-one Thousand, Nine *598 Hundred Twenty and No/100 ($31,920.00) Dollars.
For the above and foregoing’ reasons we hold that the lower court was correct in awarding the plantiff judgment for the value of the dirt hauled, delivered and spread by the plaintiff under its subcontract with the defendant, and the judgment of the trial court will be affirmed at defendant-appellant’s cost.
Affirmed.